The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Gillen. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Gillen with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the deputy commissioner as:
 STIPULATIONS
1. The parties to this action are subject to and bound by the North Carolina Workers' Compensation Act.
2. At all relevant times, an employer-employee relationship existed between plaintiff and defendant. *Page 2 
3. Liberty Mutual Insurance Company was the carrier on the risk at all relevant times.
 4. Plaintiff's pertinent average weekly wage was $476.33.
 5. The following were entered into evidence by stipulation:
 a. The Pre-Trial Agreement, marked as stipulated exhibit 1.
 b. Various medical records, Industrial Commission forms, photographs, and health insurance records, collectively paginated 1-178 and marked as stipulated exhibit 2.
 c. Stipulated exhibits 3 and 4 are photographs of the loading dock and truck area. These photographs are also included within stipulated exhibit 2.
 d. A letter to plaintiff from defendant-employer marked as stipulated exhibit 5.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 53 years old on the date of the hearing before the deputy commissioner. Plaintiff completed the 10th grade, but did not receive a GED and has no vocational training other than on-the-job training with various employers. Prior to April 2000 plaintiff's work history was limited to machine repair and automotive mechanics.
2. Plaintiff began work for defendant on April 6, 2000. Plaintiff worked as an order puller. In this position plaintiff physically carried auto parts, some weighing as much as 80-90 pounds, from shelves and racks and then loaded these parts onto vehicles from a loading dock. *Page 3 
Plaintiff's job also included pulling auto parts and delivering them to the front counter when parts were ordered by customers during the day. He worked in this capacity continuously and without interruption until August 2, 2005. Throughout his employment with defendant, plaintiff received annual evaluations commending his job performance, received annual raises, and never had any disciplinary action taken against him.
3. Plaintiff normally arrived for work by 7:00 a.m. At 7:00 a.m., typically the orders pulled from the previous day would be staged near each of the four bay doors of the loading dock, with defendant's pick-up trucks backed up to the loading dock near the bay doors. Larger parts were loaded into the bed of the trucks and smaller parts into the cab. In order to load the smaller parts into the truck cabs, plaintiff would have to step from the loading dock to the truck and jump from the truck onto the cement pavement. This process was necessary because defendant, by policy, kept locked the only entrance/exit door from the loading dock to the pavement.
4. On August 2, 2005 plaintiff arrived at work at 7:00 a.m. and began loading a truck at a bay door with a co-worker. Once the larger parts were loaded into the bed of the truck and strapped down, the co-worker moved to the next order at another bay door, leaving plaintiff to jump from the loading dock to the ground in order to load the smaller parts into the truck's cab. Because of the location of the bay doors and the orders, the co-worker could not see plaintiff as he jumped from the loading dock.
5. Plaintiff then stepped down off the dock onto the truck and jumped to the concrete pavement. Immediately after landing on the concrete pavement, plaintiff felt a sharp pain in his back and right leg. Given the positions of the various bay doors and the work being completed *Page 4 
that morning, there were no eyewitnesses to plaintiff's injury. Plaintiff worked through his pain and completed his shift that day.
6. When plaintiff arrived home that evening, plaintiff's wife observed plaintiff moving very slowly and complaining of significant pain. She asked what had happened, and plaintiff stated that he had been injured at work, describing the incident as set forth above. Plaintiff's pain worsened overnight, radiating from his back into his right leg and ankle.
7. Plaintiff reported to work the next day and told Joe Burgess, plaintiff's supervisor, about the incident and plaintiff's injury. Plaintiff asked if any paperwork needed to be completed to document the incident, but Mr. Burgess stated he was unfamiliar with the process and did not know where the paperwork was kept. Despite his pain, plaintiff worked through August 5, 2005. Plaintiff's right knee began giving out during this period.
8. On Friday, August 5, 2005, defendant's vice president, Don Ostler, visited from Salt Lake City, Utah, in connection with the arrival of a new manager, Kevin Bush, at that location. Mr. Ostler spoke to plaintiff about the incident and informed plaintiff that if he was not feeling better by the next Monday to speak to Mr. Bush, and Mr. Bush would arrange for plaintiff to see a physician.
9. On August 8, 2005, the next Monday, plaintiff reported to work at 7:00 a.m. and informed Mr. Bush of the incident and his need to see a physician. Thereafter, Mr. Bush arranged for plaintiff to visit ProMed, the approved workers' compensation physician for the defendant's employees.
10. At ProMed, plaintiff gave a history to the physician of having injured his back, right knee, and right ankle on August 2, 2005 when he jumped from a truck to the ground at work. The treating physician diagnosed plaintiff with a lumbar strain with strain of the hip, knee *Page 5 
and ankle on the right side. The treating physician noted the injury was job-related and restricted plaintiff to light duty with no stooping, bending, or sustained walking.
11. On August 15, 2005 defendant filed a Form 61, denying plaintiff's claim, and notified plaintiff that his claim had been denied on the grounds that there was not an accident as a result of his work.
12. Dan Abernathy, a co-worker of plaintiff, was called to testify by defendants and recalled working with plaintiff during the first week of August 2005 when the incident occurred. Mr. Abernathy specifically remembered plaintiff telling him about how plaintiff had hurt his back, describing the incident as above. Mr. Abernathy's testimony corroberated plaintiff's account of the August 2, 2005 incident.
13. In addition to Mr. Abernathy, defendants called George Cassell, another co-worker of plaintiff's. Mr. Cassell also testified that plaintiff informed him of the incident, describing it in the same manner as above. According to Mr. Cassell, everyone knew that plaintiff had hurt himself at work jumping to the ground. Mr. Cassell's testimony regarding the August 2, 2005 incident was consistent with plaintiff's testimony.
14. As a result of defendants' denial of plaintiff's claim, plaintiff sought treatment from his primary care physician, Dr. Terry Benson, on August 29, 2005. Dr. Benson diagnosed plaintiff as suffering from severe right sciatic back pain, ordered an MRI, and referred plaintiff to OrthoCarolina.
15. Notwithstanding his restrictions and pain, plaintiff returned to his normal job responsibilities. His condition grew progressively worse. Co-workers observed plaintiff limping and in obvious pain. Plaintiff continued to work until October 3, 2005, missing one week as a result of his injury, but otherwise working through the pain until it became unbearable. *Page 6 
16. On October 3, 2005 plaintiff presented to Dr. Eric Laxer, a Board Certified Orthopedic Surgeon, at OrthoCarolina. Dr. Laxer's October 3, 2005 medical note reflects that plaintiff gave a history of injuring himself when he jumped off a dock at work. Dr. Laxer testified that the history of injury plaintiff gave ProMed and to his primary care physician were consistent with the history plaintiff recounted to him.
17. Upon reviewing the MRI, Dr. Laxer diagnosed a large ruptured disc at L4-5. On October 20, 2005, Dr. Laxer performed a right-sided microdiscectomy at L4-5 on plaintiff. During surgery, Dr. Laxer found several large fragments that were pressing on the nerve root at L4-5.
18. Post-surgically, plaintiff continued to have pain down his right leg. Dr. Laxer obtained a second MRI. This MRI showed a smaller fragment at L4-5 on the right side irritating the nerve root. Dr. Laxer performed a second surgery to redo a microdiscectomy at L4-5 on November 30, 2005 and found and removed the smaller fragment.
19. After the second surgery, plaintiff continued to experience symptoms in his right leg. Dr. Laxer referred plaintiff to one of his partners for nerve root blocks at L4-5. These blocks did not improve plaintiff's symptoms. Plaintiff continues to treat with Dr. Laxer.
20. Dr. Laxer testified that plaintiff's condition was an acute ruptured disc caused by the August 2, 2005 work incident. Dr. Laxer further testified that the smaller fragment, removed in the second surgical procedure, was also a result of the injury at work.
21. Dr. Laxer testified that, as a result of the ruptured disc plaintiff sustained in the incident, plaintiff has been disabled from all employment from October 3, 2005 and continuing as a result of the August 2, 2005 work injury. *Page 7 
22. Plaintiff's average weekly wage on August 2, 2005 was $476.33. This wage yields a weekly workers' compensation rate of $317.57.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to establish a compensable injury to the back, plaintiff must prove that the disabling back injury arose out of and in the course of the employment and was the direct result of either an accident or a specific traumatic incident of the work assigned. N.C. Gen. Stat. §97-2(6); Richards v. Town of Valdese, 92 N.C. App. 222, 224,374 S.E.2d 116, 118 (1988), disc. review denied, 324 N.C. 337,378 S.E.2d 799 (1989). Under the specific traumatic incident theory, plaintiff is not required to prove that the injury arose from an unusual occurrence or departure from ordinary duties. Fish v. Steelcase, Inc.,116 N.C. App. 703, 707, 449 S.E.2d 233, 237 (1994), cert. denied,339 N.C. 737, 454 S.E.2d 650 (1995); Bradley v. E.B. Sportswear, Inc.,77 N.C. App. 450, 335 S.E.2d 52 (1985).
2. On August 2, 2005, as plaintiff jumped to the ground, he sustained a compensable injury to his back as a result of a specific traumatic incident from his work assigned that arose out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
3. As a result of the August 2, 2005 compensable specific traumatic incident, plaintiff has been unable to earn any wages at any employment from October 3, 2005 and continuing and is entitled to receive compensation for temporary total disability at the rate of $317.57 per week from October 3, 2005 and continuing thereafter until plaintiff returns to work or until further order of the Commission. N.C. Gen. Stat. §§ 97-2(6); 97-29. *Page 8 
4. Plaintiff is entitled to have defendants pay all medical expenses incurred or to be incurred as a result of the compensable specific traumatic incident on August 2, 2005. N.C. Gen. Stat. § 97-25.
5. Plaintiff's pertinent average weekly wage was $476.33. This wage yields a weekly workers' compensation rate of $317.57. N.C. Gen. Stat. § 97-29.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. For plaintiff's compensable back injury, defendants shall pay plaintiff, subject to the attorney's fee approved below, temporary total disability compensation at the rate of $317.57 per week for the time period beginning October 3, 2005 and continuing thereafter until plaintiff returns to work or until further order of the Commission. Amounts that have accrued shall be paid to plaintiff in a lump sum subject to the attorney's fee approved below.
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of plaintiff's compensable back injury.
3. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid as follows: Twenty-five percent of any lump sum due plaintiff shall be deducted and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Pursuant to N.C. Gen. Stat. § 97-88, defendants shall pay to plaintiff as part of the bill of costs a reasonable attorney fee for legal services provided to plaintiff by plaintiff's *Page 9 
counsel for the appeal of this matter to the Full Commission. Plaintiff's counsel shall submit to the undersigned an itemized statement of the hours expended by plaintiff's counsel in the appeal of this matter to the Full Commission.
5. Defendants shall pay the costs.
This the 16th day of March, 2007.
S/_____________________
BUCK LATTIMORE
CHAIRMAN
CONCURRING:
S/_____________________
PAMELA T. YOUNG
COMMISSIONER
S/_____________________
BERNADINE S. BALLANCE
COMMISSIONER